## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GENERAL MOTORS CORP.,
GM DE MEXICO S. DE R.L. DE C.V.,
and GENERAL MOTORS OF CANADA, LTD,

      Plaintiffs,

                                       Case No. 08-12671

v.                                       Hon. Lawrence P. Zatkoff

ALBERT WEBER GMBH and
WEBER AUTOMOTIVE CORP.,

      Defendants.
_____/

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on June 14, 2012

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

This matter is before the Court on Plaintiffs' motion for summary judgment [dkt 62].  The

parties have fully briefed the motion.  After review of the parties' papers, the Court ordered the

parties to file supplemental briefing to explain specific terms used between the parties in their course

of dealing.  The parties have provided the requested supplemental briefing.  The Court finds that the

facts and legal arguments are adequately presented in the parties' papers such that the decision

process would not be significantly aided by oral argument.  Therefore, pursuant to E.D. Mich. L.R.

7.1(f)(2), it is hereby ORDERED that the motion be resolved on the briefs submitted.  For the

following reasons, Plaintiffs' motion for summary judgment is GRANTED.

## II.  BACKGROUND

Plaintiff General Motors Corp. is an automobile manufacturer headquartered in Detroit, Michigan.  Plaintiffs GM de Mexico S. De R.L. De C.V. ("GM Mexico") and GM of Canada, Ltd., ("GM Canada") are subsidiaries of General Motors Corp.  Since the filing of this case, claims related to General Motors Corp. were stayed after it filed for bankruptcy.[1]  This case has proceeded on the claims involving the remaining Plaintiffs—GM Mexico and GM Canada (collectively referred to as "GM").

Defendant Albert Weber GMBH is a German entity that produces and supplies specialized automotive parts, including crankshafts and engine blocks, to manufacturers such as GM.[2] Defendant Weber Automotive Corp. is a North American subsidiary of Defendant Albert Weber GMBH (collectively referred to as "Weber").  The principals of Weber are Albert Weber, and his two sons, Christian and Daniel Weber.  During the period in which these claims arose, Christian Weber acted as Chief Operating Officer and Daniel Weber acted as Vice President of Sales.

This cases arises from negotiations between the parties in which Weber would supply GM with machined engine blocks and crankshafts.  GM Mexico required the supply of machined crankshafts for a High Feature V6 engine ("the HFV6 Crankshafts") and an aluminum V8 engine. Weber was to supply the HFV6 Crankshafts to GM Mexico's engine plant in Ramos, Mexico and crankshafts for the aluminum V-8 engine to Silao, Mexico.  GM Canada required the supply of

---

[1] *In re General Motors Corp.*, no. 09-50026 (U.S. Bankr. Ct. S.D.N.Y. June 1, 2009).

[2] The crankshaft is formed from a piece of metal.  It functions as a part in the engine of a vehicle that converts the force from the combustion of fuel into a rotational force that ultimately turns the wheels on the vehicle.  The crankshaft is supported inside the engine block.  The engine block is also formed from metal and comprises the largest part of the engine.  It primarily functions as a base for most other parts of the engine to attach.

2

machined engine blocks.  GM Mexico and GM Canada issued purchase orders ("POs") to Weber

to machine the engine blocks and crankshafts.  The POs were issued by GM after Weber was

approved as a supplier of the parts.  In general terms, the PO serves as the written contract between

the parties that sets forth the applicable part price, the time period of the contract, and other various

conditions and terms.

In October of 2006, Weber issued a quotation to GM for the supply of the HFV6

Crankshafts.[3]  The quotation made GM responsible for the forging costs of the crankshafts.[4]  In

November of 2006, Antero Rodarte, GM's Senior Buyer of Powertrain, ("Rodarte of GM") sent a

nomination letter to Weber.  The nomination letter references Weber's quotation and advises Weber

that it had been selected as supplier of the HFV6 Crankshafts.  The letter indicates that the price per

part will be for "Machining and Assembly only."  It further indicates GM's decision to have Weber

procure the forging from ThyssenKrupp Crankshaft Co. ("TK"), and that the POs issued to Weber

"will include the forging price."[5]  Disputing that Weber would be responsible for the forging costs,

---

[3]The quotation is identified as quotation No. 10055/001-016-2.  Section 2.1 of the quotation lists the grand total selling price in U.S. dollars "without forging" costs.  Section 2.1 provides: "The forging is a directed buy so all price negotiations are done between GM and ThyssenKrupp [, the forging supplier,] directly and [Weber] is not reliable for the forging supplier."  Based on the parties' papers, the term "reliable" is a drafting error and would more correctly read "responsible."  Section 3.3 further provides for GM to exclusively purchase its demands of the HFV6 Crankshafts from Weber.

[4] Before Weber issued the HFV6 Crankshafts quotation, Weber had issued a quotation to GM for the supply of machined V8 crankshafts.  Unlike the HFV6 Crankshafts quotation, the quoted price for V8 crankshafts included the cost of crankshaft forgings.  GM issued corresponding purchase orders for the V8 crankshafts in April 2006, and continued to do so until September 2007.

[5] Forging is the term used to identify a piece of steel that is formed into the shape of a specific engine part.  In this case, both the crankshafts and engine blocks start as a forging of steel.  The forging is then machined and polished into the final part that is installed in the engine of the vehicle.  The HFV6 crankshafts started as forgings that were approximately 20 inches long and weighed approximately 44 pounds.  Through machining, the forgings were reduced in weight by 8 to 13 pounds, resulting in the finished crankshafts.

3

Daniel Weber responded to the nomination letter, informing Rodarte of GM that "[t]he Forging will be a directed buy at [TK]. GM negotiated the price with [TK]. The outcome of this [sic] negotiations *cannot reduce [Weber's] value added*." Defs.' response to Pls.' Mot. Summ. J. Ex. 10 (emphasis added).

In December 2006, Daniel Weber, Rodarte of GM, and Marcelo Pereira, TK's Sales Account Manager ("Pereira of TK"), were involved in a conference call. According to Daniel Weber and Pereira of TK, the parties agreed during the conference call that Weber would purchase the forgings from TK, but GM would pay TK directly for any surcharges related to the forgings as a result of price increases. Defs.' response to Pls.' Mot. Summ. J. Ex. 2., at 179–182, 185 (Daniel Weber testifying that surcharges on the forgings were a pass-through cost on the HFV6 POs); *id.* at Ex. 11, at 39–40 (Pereira of TK testifying that GM agreed to pay the forging surcharges). Rodarte of GM denies that GM agreed to pay the surcharges during the conference call. *Id.* at Ex. 12, at 99–100. Surcharges is a term used to reference an additional cost associated with the forging. TK charges a base price for the forging. In addition to the base price, TK would charge an additional amount when the price of steel in the market increased over a predetermined contract price. This additional amount is the surcharges.

After the conference call, no formal contract was executed; instead, GM proceeded by issuing a series of POs to Weber to supply the HFV6 Crankshafts for assembly in the HFV6 engines.[6] Weber could accept the terms and conditions of the POs by either responding with written acceptance or commencing any work or services under the POs. Pls.' Mot. Summ. J. Ex. 27, at 9.

---

[6] GM issued separate POs for the 3.0L HFV6 crankshafts, 3.6L HFV6 crankshafts, and the LY7 crankshafts. All of the POs were based off the same HFV6 Crankshaft quotation submitted by Weber. The parties do not dispute that the language in the POs relevant to this dispute is identical.

4

The POs note that "[t]he award is *based on* [Weber's HFV6 quotation]." *Id.* at 2 (emphasis added). They also specify the price per piece, indicating that the price "includ[es] the forging part." According to the POs, the total price is "composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes." *Id.* at 3. There is no language specifically identifying who is responsible for forging *surcharges*.

The POs also provide that any "[t]erms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract."[7] *Id.* at 1. The POs may only be modified as provided in paragraph 31. Paragraph 31 provides that the POs "may only be modified by a contract amendment issued by Buyer." *Id.* at 12–13.

With respect to termination under the POs, Paragraph 11, entitled "INSOLVENCY," states that GM "may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller . . . ." *Id.* at 10. Paragraph 12, entitled "TERMINATION FOR BREACH OR NONPERFORMANCE SALE OF ASSETS OR CHANGE IN CONTROL," states that:

> Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties[;] (b) fails to perform services or deliver goods as specified by Buyer; (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

---

[7] The use of the term "seller" in the POs refers to Weber, and the use of the term "buyer" refers to GM.

*Id.*

In November 2007, Weber submitted a scheduling agreement to TK so as to source the crankshaft forgings required to perform under the HFV6 Crankshaft POs. While Weber agreed to pay TK for the forgings, the scheduling agreement indicates that "GM will pay TK for the surcharges during the production phase." Defs.' response to Pls.' Mot. Summ. J. Ex. 21. After Weber started performing under the HFV6 Crankshaft POs, GM alleges that Weber suffered financial difficulties that ultimately resulted in its inability to comply with its obligations under the POs. According to GM, Weber began losing money in 2007.

In February of 2008, Weber approached GM for financial accommodations. Weber requested that (i) GM make direct payment to TK for the forgings used in the machining of the crankshafts; (ii) GM prepay for tooling to Weber; (iii) GM pay all of Weber's invoices within ten days of shipment; (iv) GM provide volume protection on the number of crankshafts ordered; (v) GM provide foreign currency exchange protection due to the contract pricing in U.S. dollars; and (vi) GM loan Weber approximately $20 million U.S. dollars. *See* Pls.' Mot. Summ. J. Ex. 2. The Webers and Wolfgang Wiest ("Wiest of Weber"), who was Weber's Chief Financial Officer, met with GM employees. According to Albert and Christian Weber, the meeting with GM, including Robert Strimpel ("Strimpel of GM") and his boss, Nancy Shilling, GM's Director of Purchase ("Shilling of GM"), concluded with an oral agreement and a handshake as to the accommodations. Shilling of GM and Strimpel of GM, however, deny reaching this agreement, testifying that the parties had merely worked out deal points. After the meeting concluded, GM presented a written bailment agreement to Weber. Defs.' response to Pls.' Mot. Summ. J. Ex. 36. The bailment agreement provided that GM would purchase the forgings directly from TK, but the forging process would be deducted from GM's payables to Weber. Albert Weber and a representative of GM signed

6

the agreement.  A written agreement was also entered into between the parties in which GM agreed to pay for tooling prior to the time it was required to do so.  *See* Pls.' Mot. Summ. J. Ex. 5.

On March 12, 2008, GM and Weber met and discussed further accommodations that GM may provide to Weber.  According to Wiest of Weber, the exchange rate of the currency and the increase in metal prices no longer made the HFV6 Crankshaft project profitable. Pls.' Mot. Summ. J. Ex. 8, at 228–29.  Weber continued to request currency exchange rate protection, volume guarantees and GM's payment on forging surcharges.  This would allow Weber to obtain financing, resolve a cash flow problem and pay Weber's suppliers.  *Id.*  Albert Weber and Wiest of Weber requested that GM memorialize its commitments to Weber in writing.  In response, GM sent a letter, dated March 18, 2008, detailing the financial accommodations discussed.  Pls.' Mot. Summ. J. Ex. 7.  The letter expounds on further accommodations that GM would provide to Weber.  The accommodations, however, were contingent on Weber satisfying certain obligations.  The letter concludes that:

> GM's provision of the accommodations identified in this letter are also subject to execution by GM and Weber Automotive of an acceptable, definitive agreement regarding the same. For clarity, this letter does not constitute an agreement by GM to provide any of the above accommodations and is not an offer to provide such accommodations; rather, this is a summary of some of the terms which may be included in a potential agreement between GM and Weber Automotive.

*Id.*  In April 2008,  GM and Weber entered into a written letter agreement.  Pls.' Mot. Summ. J. Ex. 12.  Under the letter agreement, GM agreed to pay Weber $1,811,704 U.S. dollars for payables that were not yet due.  The letter explicitly states that because Weber has advised GM that Weber is unable to pay its vendors related to production of component parts for GM and that it is unable to perform under the GM issued POs, GM agrees to pay the payables in advance.  *See id.*

7

Throughout April and May of 2008, GM and Weber continued to correspond about Weber's financial condition.  No further accommodations were provided.  On May 23, 2008, Weber implemented a shipping hold and refused to deliver any completed parts to GM.  Pls.' Mot. Summ. J. Ex. 17.  Weber based the shipping hold on GM's failure to fulfill its obligations regarding the financial accommodations that the parties had purportedly orally agreed to during the March 12, 2008 meeting.  *Id.*  On June 3, 2008, GM contacted Weber by letter, noting that Weber's refusal to ship components to GM was in breach of the POs.  *Id.* at Ex 19.  GM further stated that if "Weber can immediately demonstrate to GM's satisfaction that it now has the ability to meet GM's requirements through the terms of its contracts with GM . . ., GM will not terminate those contracts." *Id.*

While correspondence continued between the parties, no agreement was reached.  The parties had reached a standstill.  GM requested that Weber perform under the POs and Weber insisted that it would perform under the POs only if GM acted in accordance with the accommodations requested at the March 12, 2008, conference.  On June 18, 2008, GM terminated the HFV6 Crankshaft and V8 crankshaft POs based on GM's conclusion that Weber was financially insolvent and refused to perform under the POs.  In September of 2008, GM Canada terminated the engine block POs.

The same day that GM terminated all crankshaft POs, GM initiated this action seeking a judicial declaration that its terminations were valid.  GM has since amended its complaint [dkt 4] to include four breach-of-contract claims, a claim-and-delivery claim, and a conversion claim.[8]

---

[8] GM's amended Complaint asserts the following claims: Count I–request for declaratory judgment regarding valid termination of the POs; Count II–breach of certain HFV6 Crankshaft POs; Count III–breach of the contracts related to certain V8 engine components; Count IV–breach of contracts related to certain V8 engine parts; Count V–breach of certain V8 engine components POs; Count VI–claim and delivery; and Count VII–conversion.  GM has noted in its motion and brief that it is

Weber filed a counterclaim [dkt 11], which they later amended [dkt 17], charging GM Mexico with breaching the purchase-order agreements and demanding over $200,000,000 in damages.[9] GM has moved for summary judgment on its claims and Weber's claims as to liability only.

### III. LEGAL STANDARD

When considering a motion for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.

---

dismissing the counts for claim and delivery and conversion. As such, the Court will not address Counts VI and VII.

[9] Weber asserts the following counter claims against GM Mexico: Count I–GM Mexico's breach of the HFV6 Crankshaft POs; Count II–GM Mexico's breach of the V8 crankshaft POs; and Count III–GM Mexico's breach of the engine block POs. Weber asserts breach of the engine block POs against GM Mexico, while GM alleges that GM Canada ultimately terminated the engine block POs. Based on a review of the pleadings, GM Mexico may have initially issued the first engine block PO, but it appears that GM Canada was added as the buyer on the POs on November 31, 2007. Nonetheless, as the Court explains, GM properly terminated the engine block POs and more significantly, neither party argues that the incorrect GM subsidiary terminated the POs.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

### A.  WHETHER MEXICAN LAW APPLIES

As a threshold issue, the Court must determine whether to apply Mexican law as the POs provide for in a choice-of-law clause and the applicability of which the parties do not dispute.   In a diversity case, a federal district court "is obligated to apply the choice-of-law rules of the state in which it sits." *Security Ins. Co. v. Kevin Tucker & Assoc.*, 64 F.3d 1001, 1005 (6th Cir. 1995); *Mahne v. Ford Motor Co.*, 900 F.2d 83, 86 (6th Cir. 1990), *cert den.*, 498 U.S. 941 (1990).  Thus, the Court must look to Michigan choice-of-law rules with respect to contractual disputes.  For contractual disputes, Michigan adopted § 187 of the Restatement (Second) of Conflict of Laws. *Chrysler Corp. v. Skyline Indus. Servs., Inc.*, 528 N.W.2d 698, 702 (Mich. 1995).  Section 187(2) provides that the parties will be bound by a contractual choice-of-law clause *unless*:

a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under § 188,[10] would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2); *see also Kipin Indus., Inc. v. Van Deilen Int'l, Inc.*, 182 F.3d 490, 493 (6th Cir. 1999).

The choice-of-law clause in paragraph 29 of the POs provides as follows: "This contract is to be construed according to the laws of the country . . . from which this contract is issued as shown by the address of Buyer."  Based on the address listed on the Crankshaft POs, GM Mexico issued the POs from Mexico.[11]  The Court finds no reason as to why the parties are not bound by the choice-of-law clause in the POs.  First, choice-of-law clauses generally are enforced in Michigan. *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006) (explaining that Michigan's public policy favors the enforcement of choice-of-law clauses); *Offerdahl v. Silverstein*, 569 N.W.2d 834, 835–36 (Mich. Ct. App. 1997) (recognizing the enforceability of forum-selection and choice-of-law clauses).

Second, the chosen state's law (Mexico) that will govern this dispute has a substantial

---

[10]According to § 188, to determine which state's laws control, if a choice-of-law provision is absent, the district court analyzes: (1) where the contract was formed; (2) where performance of the contract is expected; and (3) the domicile and place of business of the parties with respect to the particular claims before the Court.  Restatement (Second) of Conflict of Laws § 188(2).

[11] For reasons discussed, *supra*, whether Mexican law applies to the parties' conduct under the POs issued by GM Canada is not at issue.  Those POs involved the supply of engine blocks, which Weber fails to dispute and the Court finds were properly terminated.

11

relationship to the parties and therefore, the parties' choice is reasonable.  GM Mexico issued the POs.  As a company located in Mexico and doing business in Mexico, it is reasonable for the parties to agree that Mexican law governs the POs.  Third, neither party has produced Mexican law to the Court that violates a fundamental policy of Michigan law.  As is demonstrated by the Court's review of the Mexican law submitted by the parties, Mexico's contract law is similar to Michigan contract law.  The Court therefore finds that the choice-of-law clause is enforceable and will apply Mexican law to the extent that it is necessary.

**B.  WHETHER GM PROPERLY TERMINATED THE HFV6 CRANKSHAFT POS**

Neither party contends that the POs were not binding contracts.  Rather, the parties' arguments focus on whether all terms of the POs were performed and whether any terms were modified by subsequent agreements.  According to Mexican law, during contract formation, the parties can include and agree to any terms they so desire.  Pls.' Mot. Summ J. Ex. 28.  Those terms will be enforced if they are clear and unequivocal unless they contradicted the established intent of the parties, in which case the parties' intentions prevail.  *Id.*

GM argues that the termination of the POs was proper for two reasons: (a) Weber repudiated the contracts and breached the terms of the POs by refusing to deliver goods, and (b) Weber admitted that it was insolvent, and insolvency of Weber was a condition in the POs that permitted termination.  Weber argues that the events that GM cites to justify its termination occurred on and after April 23, 2008.  Before April 23, Weber argues that GM already (1) breached the POs by failing to pay forging surcharges to TK; (2) breached its agreement to provide financial accommodations; and (3) breached the POs by requesting process and engineering changes.  Weber concludes these are sufficient reasons to deny GM's motion.  The Court will turn to Weber's

arguments first.

**1. Whether GM breached the POs by failing to pay the forging surcharges**

On March 28, 2008, Pereira of TK contacted Daniel Weber to inform him that GM refused to pay the surcharges on the forgings. Unless GM or Weber paid the surcharges, TK would stop the supply of forgings to Weber. As a result, Weber maintains that GM breached the POs first by refusing to pay the surcharges. Weber's argument is without merit as the record indicates that Weber breached the POs prior to March 2008—the date GM refused to pay the forging surcharges. In January 2008, Weber was unable to obtain the needed forgings from TK to machine the crankshafts to GM's specifications because Weber had insufficient funds to pay for them. To resolve the issue and ensure that GM would receive machined crankshafts, GM had to enter into the bailment agreement (effective date February 15, 2008), under which GM paid TK directly for the forgings. In return, TK supplied the forgings to Weber for machining. The bailment agreement also provided that GM was then able to setoff and recoup the costs of the forgings from its accounts payable to Weber.

Thus, even if GM had refused to pay surcharges in March 2008, which Weber asserts that GM was obligated to do, Weber already breached paragraph 12 of the POs. Paragraph 12 provides that GM may terminate the POs without liability to Weber if Weber "fails to perform services or deliver goods as specified" by GM and "fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure." Pls.' Mot. Summ. J. Ex. 27, at 10. Weber's inability to acquire the forgings from TK in January was a failure to perform services as specified, and the inability to acquire forgings endangered the timely and proper completion of services or delivery of crankshafts to GM. GM had to enter into the bailment

13

agreement to ensure that the supply of crankshafts by Weber to GM would not be affected.  Without GM's assistance, Weber would have been unable to continue to perform under the POs.

Moreover, drawing all reasonable inferences in favor of Weber, Weber's argument that GM was required to pay the surcharges on the forgings is not supported by the terms of the POs or any additional agreements entered into between the parties.  Weber points to its HFV6 quotation as proof that GM was responsible for paying the forging surcharges.  Weber's HFV6 quotation states that its prices do not include the costs of forgings and GM is responsible for the forging supplier.  According to Weber, the terms of the quotation were incorporated into the HFV6 Crankshaft POs by the language that reads "[t]he award is based on the quotation number 100555/001-016-2."  *Id.* at 2.  Weber also argues that before the POs were issued, the parties had a conference call, in which GM agreed to pay for the surcharges.  Last, Weber relies on the language in the V8 crankshaft POs, which contain a notation that Weber is responsible for the forging costs and no surcharge costs are permitted.

Weber's arguments fail for several reasons.  First, the POs state that the award is *based* on Weber's quotation, but the explicit language does not state that the POs *incorporate* or *include* the terms of Weber's quotation.[12]  *See* Pls.' Mot. Summ. J. Ex. 27.

Second, after Weber issued the quotation, GM responded to Weber with a nomination letter, indicating that Weber had been selected as the supplier for the HFV6 Crankshafts.[13]  The nomination

---

[12] Strimpel of GM explained the reasoning as to why the quotation number is included in the POs. Strimpel of GM testified that GM generally places the quotation number in the PO to keep track of the latest quote received from the supplier.  Pls.' Reply Br. Ex. 51, at 25–26.

[13] A nomination letter is a typed document sent by GM to a supplier that has been awarded a project. The POs, however, contain the terms and conditions agreed to between the parties.

14

letter directly contradicted the quotation's provision that GM would be responsible for surcharges.

Weber even states the same in its response brief:

> GM's nomination letter did not accept the terms offered by Weber, particularly with respect to forging responsibility. Contrary to Weber's HFV6 Quote, GM's nomination letter proposed that Weber include the forging price in its total price to GM, which would have shifted responsibility for any price increases to Weber.

Defs.' Response to Pls.' Mot. Summ. J. at 3.

Third, the plain language of the POs does not include any language regarding GM's responsibility for the surcharges. Rather the provisions in the POs establish that any material costs are included in the price of the crankshaft to GM and are thus Weber's responsibility. The POs state that the "Total Price is composed of Base Price *plus any Material costs*, Price Component costs and any applicable taxes." Pls.' Mot. Summ. J. Ex. 27, at 3 (emphasis added). Moreover, a provision under the "Contract Lifetime Agreement" section of the POs provides that "The price(s) for the goods are set forth in the Contract. No adjustments will be made for increases in Seller's costs, including increases in the costs for labor, *material* or overhead." *Id.* at Ex. 27 (emphasis added). Because the forgings are a material part of the crankshaft, any cost increases are not GM's responsibility under the POs, and the total price per machined crankshaft includes the base price plus any material costs. Therefore, the plain language of the POs establishes that GM did not assume the cost of the forging surcharges.

Fourth, there is insufficient evidence regarding the December 2006 conference call to create a genuine dispute of fact that GM agreed to pay the surcharges. While Pereira of TK and Daniel Weber's testimony conflicts with Rodarte of GM's testimony regarding whether GM agreed to pay for the surcharges, the provisions in the POs expressly state that all prior oral or written agreements

15

are superseded by the terms in the POs. The POs were issued in January 2007—a month after the conference call. The POs first page provides that "[t]erms and conditions proposed by seller which are different from or in addition to the provisions of this contract are unacceptable to buyer, are expressly rejected by buyer, and shall not become a part of this contract." *Id.* at 9. Similar language is reiterated in paragraphs 1 and 31 of the PO attachment. Paragraph 1 provides "Seller's . . . acceptance . . . under this contract shall constitute Seller's acceptance of these terms and conditions only." *Id.* at 7. Paragraph 31 states, "This contract . . . constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements." *Id.* at 12–13.

Even if a written agreement was entered into between the parties, Weber has produced no evidence to the Court that such an agreement exists that modified the POs. This is because, according to the record, no such agreement exists. Pereira of TK wrote in a March 26, 2008, e-mail to an employee of Weber, "In a conference call with GM, Antero Rodarte, AW, Daniel Weber, and myself, it was defined that GM will pay TK for the surcharges during the production phase. However *we still not* [sic] *have this confirmation in writing from GM.*" Defs.' Response to Pls.' Mot. Summ. J. Ex. 44 (emphasis added). Daniel Weber also testified that he was not aware of any e-mails that established that GM agreed to pay for surcharges during the conference. The only other evidence that indicates that GM would pay for the forging surcharges was the scheduling agreement issued by Weber to TK. This agreement, however, does not modify the relationship between Weber and GM as expressed in the POs.

Fifth, Weber's reliance on the POs issued for the V8 crankshafts starting in April 2006 as evidence of other conduct between the parties is unpersuasive. In response to a quotation issued to

16

GM regarding the V8 crankshafts, GM issued a purchase order to Weber that states: "[f]ixed price during all program, no surcharge payments or material price adjustments allowed." Defs.' Response to Pls.' Mot. Summ. J. Ex. 17; *see also id.* Ex. 18 (same), Ex. 19 (same), Ex. 20 (stating that "[n]o changes on the piece price will be made based on material fluctuations"). Weber argues that this makes clear that GM took responsibility for forging surcharges incurred in manufacturing the HFV6 Crankshafts, but not the V8 crankshafts. The V8 crankshaft POs, however, also contain the same language regarding the price composition as the HFV6 Crankshafts POs. The V8 crankshaft POs state that price composition, like the HFV6 POs, is "[t]he Total Price composed of Base Price plus any Base Material costs, Price Component costs and any applicable taxes." *Id.* Thus, to argue that the V8 crankshaft POs specifically state that surcharges are assumed whereas the HFV6 Crankshaft POs do not, is untenable when the price composition language used in the POs is identical. Accordingly, for the reasons set forth above, the Court finds no genuine dispute of fact that Weber was responsible for the forging costs, including the surcharges.

**2. Whether GM breached its agreement to provide financial accommodations**

Weber also asserts that GM was waiting for Weber to breach the POs so that GM could terminate the POs. According to Weber, GM breached its agreement to provide financial accommodations so that Weber would fail and GM could contract with another supplier. The record supports Weber's assertion that GM was looking into an alternative supplier. Internal GM communications demonstrate that GM was concerned about the logistic risks of Weber supplying the crankshaft to Ramos, Mexico and was looking into contracting with "Macimex" to supply the crankshafts. Defs.' Response Pls.' Mot. Summ. J. Ex. 33.

The Court, however, finds that Weber has produced no evidence to show that GM breached

17

the POs by merely considering an alternative supplier as there is no evidence that GM ordered parts from "Macimex" prior to termination of the POs. Considering an alternative supplier as a back-up supplier is typical in the automotive industry for GM to ensure that it has alternative suppliers for any given part. This guarantees that a failure on behalf of the primary supplier will not halt production of GM vehicles. Weber even concedes that under certain circumstances it is prudent for a manufacturer to have an alternative supplier in case the primary supplier breaches its supply obligations.

Moreover, Weber's allegations that GM breached certain financial accommodations agreed upon by the parties is unsupported by the record. On April 28, 2008, the parties did enter into an agreement, in which GM agreed to pay Weber $1,811,704 U.S. dollars in advance on future account payables. The agreement provides that no further accommodations would be provided. Weber produces no evidence that GM breached this agreement.

Furthermore, the POs contain no provisions that require GM to provide Weber financial accommodations or ensure that Weber is able to obtain financing based on the account receivables from GM's business. As the Court discusses in section 4, *supra*, Weber's reliance on the March 12, 2008, conference as the point where GM agreed to financial accommodations it later refused to honor is not supported by the record. A letter summarizing the meeting, of which the accuracy of its summary is not disputed, indicates that the parties would work on entering a written agreement regarding the financial accommodations discussed. There is no evidence that such an agreement was ever reached. As such, Weber's argument that GM breached certain financial accommodations fails.

### 3. Whether GM breached the POs by requesting processing and engineering changes

Weber further argues that it submitted the crankshaft quotation based on its single-pass

18

polishing procedure.  After GM issued its POs, it required Weber to use GM's processing technique of a two-pass polish and grinding.  Weber argues that GM breached the POs by requesting processing and engineering changes on the crankshafts.

Weber's argument is futile; the POs provide that GM "reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract . . . and Seller agrees to promptly make such changes.  Any difference in price . . . resulting from such changes shall be equitably adjusted by Buyer."  Pls.' Mot. Summ. J. Ex. 27, at 9.  Further undermining Weber's claim is its own assertions in its response brief.  Weber states that GM made further changes to the HFV6 Crankshaft by requiring the application of loctite and hardening for all crankshafts.  As Weber asserts, these changes were reflected in new POs that GM issued.  The POs, however, provide that Weber is not bound by the additional terms in the new POs until Weber gives written acceptance or commences any work under the POs.  If Weber disagreed with the new changes, it should have renegotiated the price before commencing to machine crankshafts under the new POs.  Thus, Weber's argument fails.

## 4. GM properly terminated the HFV6 Crankshaft POs

Turning to the grounds relied on by GM to terminate the POs, the Court finds that GM had a sufficient basis to terminate the POs under paragraph 12 of the POs because Weber expressly refused to deliver crankshafts that had been completed and failed to make progress so as to endanger timely and proper delivery of goods after GM gave notice on June 3, 2008, that Weber was in breach of the POs.  Paragraph 12 provides:

> Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if seller: (a) repudiates or breaches any of

19

the terms of this contract, including Seller's warranties[;] (b) fails to perform services or deliver goods as specified by Buyer; (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

Pls.' Mot. Summ. J. Ex. 27, at 10.

On May 23, 2008, Weber implemented a shipping hold and refused to deliver any completed parts to GM. *Id.* at Ex. 17. Paragraph 12 expressly states that if Weber "fails to . . . deliver goods" then GM has the right to terminate the POs. Weber has produced insufficient evidence to establish that it had a good faith basis to refuse to deliver completed crankshafts to GM. Weber therefore was in breach of paragraph 12 as of the time that Weber implemented the shipping hold.

Furthermore, on June 3, 2008, GM contacted Weber by letter, noting that Weber's refusal to ship components to GM was in breach of the POs. GM further stated that if "Weber can immediately demonstrate to GM's satisfaction that it now has the ability to meet GM's requirements through the terms of its contracts with GM . . . , GM will not terminate those contracts." *Id.* at Ex. 19. GM requested that Weber perform under the POs and Weber insisted that it would perform under the POs only if GM acted in accordance with the accommodations requested at the March 12, 2008, conference. On June 18, 2008, GM terminated the HFV6 Crankshaft POs and the V8 crankshaft POs based on GM's conclusion that Weber was unable to perform under the POs.

Weber's nonperformance under the POs based on accommodations purportedly agreed to during the March 12, 2008, conference is misplaced. Weber has produced no written agreement that identifies financial accommodations that GM failed to perform. According to Weber's June 13, 2008, letter to GM, Weber asserted that the accommodations reached on March 12, 2008, were

20

properly illustrated and described in GM's March 18, 2008, letter.   GM's March 18, 2008, letter, however clearly states that: "As we discussed during our March 12, 2008 meeting and subject to Weber Automotive's fulfillment of the conditions noted below, GM would be willing to provide certain accommodations to Weber Automotive."  Pls.' Mot. Summ. J. Ex. 7.   The letter concludes that "GM's provision of the accommodations identified in this letter are also subject to execution by GM and Weber Automotive of an acceptable, definitive agreement regarding same.  For clarity, *this letter does not constitute an agreement by GM to provide any of the above accommodations* and is not an offer to provide such accommodations . . . ."  *Id.* (emphasis added).  The Court finds no evidence that GM and Weber eventually entered into an agreement requiring GM to perform the financial accommodations upon which Weber relied on to not perform under the POs.

Lacking a good faith basis to object to performing under the POs, Weber was in breach of paragraph 12, which provides that GM may terminate the POs without liability if Weber "fails to make progress so as to endanger timely and proper completion of services or delivery of goods and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach."  First, insisting that Weber would not perform under the POs without additional accommodations clearly "endanger[s] timely and proper completion of services or delivery of goods."  Second, GM contacted Weber on June 3, 2008, and advised that Weber was in breach of the POs by failing to deliver crankshafts.  Ten days later, Weber failed to cure the breach and resume performing under the POs.  GM therefore had a proper basis to terminate the HFV6 Crankshaft POs on June 18, 2008.

21

## C.  GM PROPERLY TERMINATED THE V8 CRANKSHAFT POS

Weber's delivery hold included crankshafts machined under the V8 crankshafts POs.  As previously discussed, GM contacted Weber on June 3, 2008, identifying that Weber was breaching the POs and that Weber needed to lift the delivery hold.  Weber failed to perform under the POs and GM terminated the V8 crankshaft POs on June 18, 2008, more than ten days later.  Accordingly, for the reason that GM's termination of the HFV6 Crankshaft POs was proper, the Court finds that termination of the V8 crankshaft POs is proper.

## D.  GM PROPERLY TERMINATED THE ENGINE BLOCK POS

GM argues that it properly terminated the engine block POs with Weber due to nonperformance and failure to progress under the POs.  Specifically, GM relies on the testimony of Hans Michael Wittman, South Carolina Plant Manager for Weber.  Weber offers no rebuttal to GM's arguments in its response brief.

After review of the record, the Court agrees with GM that there is no genuine dispute of fact that it properly exercised its right under the engine block POs to terminate Weber.  Wittman's testimony supports GM's basis for terminating the POs.  Wittman testified that Weber's machinery used in producing the engine blocks was broken down approximately half of the time, engine blocks that were ultimately produced had quality defects, and Weber missed delivery dates and was constantly behind in supplying engine blocks.

Most notably, Wittman further testified that at the time of the September 2008 termination, GM had a reasonable basis to question Weber's ability to perform under the POs.  Weber provides no argument or evidence to dispute this issue in its response brief.  As the nonmoving party, Weber must produce sufficient evidence on which a trier of fact could reasonably find for the nonmoving

22

party. *See Anderson*, 477 U.S. at 252. Weber has failed to do so. The Court therefore finds that the evidence produced establishes that no genuine dispute of fact exists. GM properly terminated the engine block POs with Weber, and Weber appears to concede such by failing to properly respond to this issue in its response brief. Accordingly, GM is granted summary judgment as to whether GM properly terminated the engine block POs.

**E. CONCLUSION**

      Weber and GM are commercial entities that voluntarily decided to enter into a business relationship. While the result of that business relationship may not have benefitted Weber to the extent it believed when it accepted the POs, its arguments are far removed from the plain language of the POs and often misplaced. Finding the termination of the POs proper, the Court need not consider GM's alternative basis for terminating the POs. The Court finds that GM is entitled to summary judgment on all of its counts and Weber's counts with respect to liability. Damages remain at issue.

## V. CONCLUSION

      Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Plaintiffs' motion for summary judgment [dkt 62] is GRANTED.

      IT IS FURTHER ORDERED that the previously adjourned Final Pretrial/Settlement Conference is scheduled for **August 28, 2012, at 10:00 A.M.**, at 526 Water Street, Port Huron, MI. All counsel must be present, as well as the clients and/or those with full settlement authority. The proposed pretrial order, along with joint agreed-upon jury instructions, shall be submitted to the Judge's Chambers at the Final Pretrial/Settlement Conference. If necessary, the case will be scheduled for a trial date at the conference. Please refer to the Court's scheduling order entered at

dkt 16, regarding further instructions surrounding the Final Pretrial/Settlement Conference.

       IT IS SO ORDERED.


                    S/Lawrence P. Zatkoff           

                    LAWRENCE P. ZATKOFF

                    UNITED STATES DISTRICT JUDGE

Dated:  June 14, 2012

CERTIFICATE OF SERVICE

       The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on June 14, 2012.


                    S/Marie E. Verlinde            

                    Case Manager

                    (810) 984-3290